IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>(1) A SAMSUNG CELLULAR TELEPHONE, COLOR BLACK, MODEL NUMBER SM-N975UI AND IMEI: 359187100660747 (EXHIBIT N-36), AND<br><br>(2) AN AT&T ZTE CELLULAR TELEPHONE, COLOR BLACK/DARK GREY, MODEL NUMBER Z835, SERIAL NUMBER: 329F7602C709 AND IMEI: 864237034762602 (EXHIBIT N-36A)<br><br>EACH CURRENTLY LOCATED AT DRUG ENFORCEMENT ADMINISTRATION, PROVIDENCE DISTRICT OFFICE, WARWICK, RI | Case No. 22-SW-382 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Joseph Iannelli, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) since 2013 and am currently assigned to the DEA Providence District Office. I am also a member of The South Kingstown Police Department and have been continuously employed by The Town of South Kingstown since 2006. Prior to being sworn in as

a TFO I held the rank of Detective with The South Kingstown Police Department. As a detective I was responsible for investigating and prosecuting all types of criminal narcotic related activity being carried out by traditional and non-traditional organized crime organizations, members and their associates, in addition to investigating any and all crimes which violated the laws of the State of Rhode Island. I have attended DEA's Basic Narcotics School. Since being sworn as a Task Force Officer with the DEA I have participated in countless investigations relating to the possession and distribution of fentanyl, cocaine, heroin, marijuana as well as other controlled substances. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.      The property to be searched is: (1) a Samsung cellular telephone, color black, model SM-N975UI and IMEI: 359187100660747 (EXHIBIT N-36), and (2) an AT&T ZTE cellular telephone, color black/dark grey, model number Z835, serial number: 329F7602C709 AND IMEI: 864237034762602 (EXHIBIT N-36A), hereinafter the "Devices."  The Devices are currently located at the Drug Enforcement Administration, Providence District Office, Warwick, RI.

5.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

6.    During several months prior to August 2020, members of the Drug Enforcement Administration-Providence Resident Office[1] engaged in an investigation into suspected narcotics trafficking being conducted by an individual known at that time as Luis Cortes, DOB: XX/XX/1971 from his residence at 698 Centerville Road, Warwick, RI.[2]  Agents used a variety of investigative methods, including the controlled purchase of narcotics from CORTES by a Confidential Source working under the direct supervision of agents.  During the several months of investigation, agents established that Cortes regularly utilized a cellular phone to communicate and operate his narcotics trafficking.  For example, the aforementioned controlled purchases were arranged by a cooperating witness working with agents making contact with CORTES at his cellular telephone.  On another occasion (in July 2020), Cortes passed $100,000 USC to a cooperator working with DEA for the purpose of laundering the suspected drug proceeds.  CORTES brought a cellphone to the meeting and used the cellphone to direct the cooperator to his location at the meeting spot.  Court authorized tracking of a cellular phone utilized by CORTES established that he regularly maintained that phone at his Centerville Road residence during July 2020.

7.    On July 31, 2020, agents sought and obtained three search warrants from United States Magistrate Judge Lincoln D. Almond.  The warrants authorized the searches of: (i) the single-family residence of CORTES at 698 Centerville Road, Warwick, Rhode Island, ("698

---

[1] The Providence office of the Drug Enforcement Administration was known as the Providence Resident Office.  It has since been renamed the Providence District Office.

[2] As discussed herein, post-arrest investigation established the actual identity of Cortes to be Jose Manuel Rosario Mella.  Hereafter when I speak about Cortes or Rosario Mella, I am referring to the same individual arrested by DEA on August 12, 2020.

Centerville Road"); (ii) a 2016 Mazda SUV, color black, bearing Rhode Island vehicle registration KW374, registered to Darinel A Ramirez DOB XX/XX/74, 54 Tremont St Apt 1 Central Falls RI 02863, and regularly used by CORTES ("Mazda SUV"), and (iii) a 2007 BMW sedan 335i, color black, bearing Massachusetts vehicle registration 7LD967, registered to CORTES and regularly operated by him ("BMW 335i").

8. During the morning of August 12, 2020, agents observed CORTES leave 698 Centerville Road and enter the BMW 335i which was parked in the driveway. A short distance from the residence, agents stopped the BMW 335i in order to execute the search warrant for the vehicle. The Devices were with Cortes in the vehicle and seized by officers on the scene. Prior to searching the vehicle, a certified narcotics detection canine conducted a sniff of the exterior of the vehicle. The canine alerted to the presence of narcotics odors at the vehicle. During the subsequent search of the interior of the vehicle, agents located an after-market hide behind the front passenger seat. This compartment was large enough to conceal more than one kilogram of narcotics. Agents searched a child safety seat also located in the BMW 335i. During the search agents identified an after-market concealed compartment in the child safety seat. This hide was large enough to conceal a kilogram of narcotics. Photographs were taken of each of these compartments.

9. Near the time of the stop of the motor vehicle, agents executed the search warrant at 698 Centerville Road. Present in the single-family residence were an adult female and two young female children. Based upon statements made by the adult woman, agents determined she was in a romantic relationship with CORTES and the two children were hers.

10. During the execution of the search warrant at 698 Centerville Road, agents located and seized the following items from the residence:

(a) Approximately one kilogram of suspected heroin wrapped in dark-colored tape/plastic-this was located and seized from the top shelf of a first floor closet at the residence. A field test confirmed the presumptive presence of heroin. The gross weight of the suspected heroin (including an evidence bag) was 1079 grams. Later forensic testing at DEA's Northeast Regional Laboratory confirmed this to be approximately 1002 grams of heroin.

(b) A 9mm semi-automatic Glock pistol-this was located and seized from a concealed compartment in the master bathroom that was connected to the master bedroom. The gun was in a carrying case with two magazines. One magazine was fully loaded.

(c) Approximately $200,000-$250,000 United States currency. This money was also located in the same concealed compartment in the master bathroom where the pistol was located.

(d) Three (3) kilo presses located and seized from: basement; first floor and a closet in the master bedroom of the residence-these devices are used to compress a kilogram of narcotics which aids in the transportation and distribution of kilogram amounts of controlled substance.

(e) Items used in the packaging of kilograms of controlled substances which included: three (3) large rolls of cellophane wrapping located on a bureau in the master bedroom and a backpack containing two (2) scales, a sifter, a grinder and a mixer located in a closet also in the master bedroom.

(f) a Dominican Republic birth certificate in the name of Rosario Mella.

11.  Up until and through the time of arrest, agents identified the target of the investigation as Luis CORTES. Agents obtained a MA operator's license for CORTES, DOB:

XX/XX/1971. They observed the operator's license photograph and a description of CORTES on the license matched the appearance and description of the target of the investigation. Additionally, electric records for 698 Centerville Road are in the name of Luis CORTES.

12.     At the time of arrest, CORTES maintained to agents from the DEA-PDO that his name was Luis CORTES. Agents then obtained images of the fingerprints of CORTES and transmitted those images to the FBI for comparison against known persons. The FBI confirmed that the fingerprinted person was known as both Danny Vasquez and Alberto Diaz with dates of birth including: 09/28/1966; 11/30/1970 and 11/30/1971. This FBI report listed a previous address of 1168 Sheridan Avenue, Bronx, NY. Additionally, the FBI report identified arrests in New York in 1997, 1998 and 2002.

13.     In furtherance of the investigation, I sought assistance from law enforcement officials in the Dominican Republic to positively identify CORTES aka Vasquez aka Diaz. I obtained a Dominican Republic identification document, referred to as a cedula, in the name of Jose Manuel Rosario Mella. The photograph on that identification matched the appearance of the individual who represented himself to DEA as Luis Cortes at the time of his August 2020 arrest. A comparison of fingerprints maintained in the Dominican Republic for Rosario Mella matched the fingerprint impressions obtained from CORTES at the time of his arrest by DEA in August 2020.

14.     Additionally, based on my training and experience and my participation in this and other controlled substance investigations, I know that it is common for drug dealers to use wireless cellular telephones to facilitate their drug distribution operations. I also know that drug trafficking is an illicit business and an ongoing process requiring the development, use and protection of a communication network to facilitate daily drug distribution. Drug dealers use

various methods to thwart law enforcement detection, often using multiple wireless cellular telephones for different purposes, some to communicate with suppliers, others to communicate with customers and still others to communicate with accomplices and frequently change cellular phones. It is common in drug trafficking investigations to seize multiple telephones from a single drug trafficking offender. Even when a drug trafficker maintains a personal telephone to communicate with family and friends, those telephones often contain evidence relevant to the criminal investigation, for example, scheduling information, travel arrangements, photographs, GPS location data and other information of the type described in Attachment Bf.

15. The Devices are currently in the lawful possession of the DEA. It came into the DEA's possession in the following way: they were seized during the execution of a search warrant, as described above. Therefore, while the DEA might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

16. The Devices are currently in storage at DEA Providence District Office, Warwick, RI. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the DEA.

## TECHNICAL TERMS

17. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a

    telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

22.  *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

23.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully Submitted,

JOSEPH IANNELLI
Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ Telephone _____.
(Specify reliable electronic means)

December 5, 2022
*Date*

*Judge's signature*

**Providence RI**
*City and State,*

Lincoln D Almond USMJ
*U.S. Magistrate Judge*

# ATTACHMENT A

The property to be searched is: (1) a Samsung cellular telephone, color black, model SM-N975UI and IMEI: 359187100660747 (EXHIBIT N-36), and (2) an AT&T ZTE cellular telephone, color black/dark grey, model number Z835, serial number: 329F7602C709 AND IMEI: 864237034762602 (EXHIBIT N-36A), hereinafter the "Devices."  The Devices are currently located at the Drug Enforcement Administration, Providence District Office, Warwick, RI.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (distribution of controlled substances and conspiracy to distribute controlled substances), and 21 U.S.C. § 843(b) (using a communication facility to commit, cause or facilitate the commission of a drug felony) and involve Edilio A. Orellana, between June 1, 2020 and August 12, 2020, including:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d. any information recording Edilio Orellana's schedule or travel from June 1, 2020 to August 12, 2020;

    e. all bank records, checks, credit card bills, account information, and other financial records.

2.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.